CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 12 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| FRANKIE M. MILLER, JR., | CASE NO. 7:11CV00180 |
| Plaintiff, | |
| | MEMORANDUM OPINION |
| vs. | |
| ROBERT O. MARSH, ET AL., | By: Glen E. Conrad |
| | Chief United States District Judge |
| Defendant(s). | |

Frankie M. Miller, Jr., a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant prison officials acted with deliberate indifference to his serious medical need for treatment of severe foot, hip, and groin pain while he was incarcerated at Augusta Correctional Center ("Augusta").[1] After review of the parties' pleadings, the court concludes that defendants' dispositive motions must be granted.

## I. Background

Miller alleges the following sequence of events on which he bases his claims. Miller first experienced foot and heel pain while working long hours in the kitchen at Wallens Ridge State Prison. The Wallens Ridge staff physician diagnosed Miller's condition as plantar facitis, prescribed Tylenol, and told Miller that his flat feet would continue to hurt without proper shoes that Wallens Ridge would not supply.

In June 2007, authorities transferred Miller to Keen Mountain Correctional Center, where he complained to medical staff 21 times that his foot pain prevented him from walking or

---

[1] Miller sues the following individuals: John Otho Marsh, M.D. (Miller misidentified this defendant as "Robert"), Miller's treating physician at Augusta; A. Meadows, Augusta medical administrator and head nurse; Fred Schilling, director of health services for the Virginia Department of Corrections ("VDOC"); Dr. Harvard Stephens, M.D., VDOC chief physician; and D. Hepler, secretary for the Augusta medical unit.

standing properly. Staff provided Miller a pair of Spenco Arch supports in July 2007, but they were ineffective in relieving his foot pain. Dr. Quinones told Miller to purchase tennis shoes and insoles from the canteen, which Miller did, and to stretch, exercise, and lose weight to help alleviate his foot and heel pain. The doctor said Miller would be referred to a podiatrist, but never arranged for this consult.

One day in 2008, Miller was stretching and felt a snapping or popping sensation in his hips and groin area, which became very sore by the following morning. Tylenol did not relieve this pain. Doctor McBride examined Miller in February 2009, ordered X-rays, and prescribed "Prednozone." A month later, authorities transferred Miller to Augusta.

Miller first met with Dr. Marsh at Augusta on April 7, 2009. Miller told Marsh about his ongoing problems with foot and heel pain and the stretching incident in 2007 when he felt the snapping sensation in his hips, followed by severe pain in that area. Dr. Marsh examined the X-rays Dr. McBride had ordered and told Miller that they revealed degenerative changes in his hip, characterized by "osteophytosis and subchondral sclerosis." Dr. Marsh prescribed medication and an injection.

At a visit with Dr. Marsh on December 29, 2009, Miller complained that he continued to suffer hip and foot pain. Dr. Marsh said that he could "do nothing further" to treat Miller's hip pain, that Miller had arthritis in his hips that would continue to be painful for the rest of his life, and that eventually Miller would need a hip replacement for which he was too young at that time. Dr. Marsh told Miller to keep stretching and exercising, wrote an order for Miller to be assigned to a lower bunk on the bottom floor of the facility, and put Miller on "medical no work status (D)," exempting him from any kind of work.

2

Miller returned to Dr. Marsh in early April 2010, with continued complaints of pain in his hips and heels. Miller told Dr. Marsh that the prescription medication, Volteren, was causing "kidney pain" and asked Dr. Marsh to provide him with proper boots or tennis shoes to accommodate Miller's flat feet. The doctor agreed that flat feet could contribute to Miller's hip pain, but did not prescribe special shoes. Instead, Dr. Marsh told Miller that New Balance tennis shoes available through the commissary had good arch support and would be best for his feet. Dr. Marsh placed Miller on work status (C) so that Miller could do light work and earn money to order the special shoes. The doctor also prescribed a different medication for pain, Percogesic, only to discontinue the medication later, based on Miller's complaint that it did not alleviate his hip and foot pain and made him drowsy.

Miller got the recommended shoes, but found that they did not have much arch and that wearing them did not alleviate his foot pain. On June 25, 2010, Miller reported these developments to Dr. Marsh, who ordered a pair of Absorb Pro arch supports. After wearing the supports for three weeks, Miller found that they were too narrow for his wide feet and reported these problems to Dr. Marsh on August 5, 2010. The doctor said there was nothing further he could do for Miller, except to allow him to pick another pair of arch supports from the options in the secretary's catalog.

Miller talked to the secretary, Defendant Helpler, on August 13, 2010, about ordering different arches and showed her that the arch supports he had were too narrow. Helpler said that Miller already had the "best one" and refused to order any new ones. Dr. Marsh and Nurse Meadows recognized that the arch supports were not ideal, but did nothing to help Miller obtain better ones.

3

Miller asked Dr. Marsh on September 14, 2010, to refer him to a podiatrist who could recommend additional treatment for his foot pain. The doctor explained that the VDOC Office of Health Services (OHS) would not allow the referral, based on Miller's diagnosis of degenerative hip disease for which there is no cure, and advised Miller to continue stretching. Dr. Marsh also told Miller that he could do nothing further to treat Miller's foot pain, other than treatments Miller had already tried. The doctor said that he could not prescribe anti-inflammatory medications because of Miller's allergy to aspirin and offered to prescribe Percogesic again; Miller said he would not refuse this medication, so Dr. Marsh wrote the prescription.

Miller also complained to Dr. Marsh during this visit that he had been suffering with foot and hip pain since 2007, that all treatment provided by the VDOC doctors had been ineffective, and that the VDOC was denying him effective treatment because of the cost. Dr. Marsh became "upset, repeatedly [stating], don't say that, that's not true," and told an officer that Miller was "being irrational"; at the doctor's direction, the officer then escorted Miller out of the medical department.

When Miller continued to submit informal complaints about his hip and foot pain over the next several weeks, staff did not schedule follow-up doctor appointments, based on Dr. Marsh's determination that he could provide no further treatment other than that already attempted for Miller's conditions. In the fall of 2010, Miller wrote repeated complaints to Defendant Meadows, the medical administrator at Augusta, asserting he was receiving "no treatment" for his ongoing hip and foot pain and that Dr. Marsh had refused his requests for a referral to a podiatrist. Meadows advised Miller to follow doctor's orders, reminded him of the doctor's judgment that there was no cure for Miller's degenerative hip disease and that he would

live with some pain, and told him that the doctor's decision about referrals to outside specialists was final.

Miller complained verbally to the security staff and the warden, and wrote complaints to Defendants Stephens and Schilling, stating that the treatment Dr. Marsh had provided was ineffective in alleviating Miller's hip and foot pain. In December 2010, officials transferred Miller to Greensville Correctional Center, where he continued to write complaints to VDOC administrators.[2] In response, officials determined Miller's grievances to be unfounded and reminded Miller that Dr. Marsh at Augusta and the medical staff at Greensville had provided extensive treatment for Miller's conditions.

Miller claims that he complained 49 times to medical staff at Augusta, between April 7, 2009 and September 14, 2010, advising them that the treatments provided were ineffective in addressing his pain, but the defendants failed to ensure that he received effective treatment. Miller asserts that because of his medical conditions, he cannot walk, stand, sit down, or lie down without excruciating pain and that because of the pain, he has allegedly lost sleep, lost weight, missed work opportunities, and dropped classes. Miller seeks compensatory and punitive damages, as well as equitable relief.[3]

Defendants Marsh and Meadows filed a motion to dismiss, and defendants Hepler, Stephens, and Schilling filed a motion for summary judgment. Miller filed a motion for

---

[2] Miller states that a doctor at Greensville told Miller in February 2011 that he would recommend that Miller be referred to a specialist for evaluation of his hip and heel pain. Miller does not state whether this referral has occurred.

[3] Because Miller is no longer incarcerated at Augusta Correctional Center, where the alleged constitutional violations occurred, his claims for injunctive relief are moot. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

voluntary dismissal of his claims against Defendant Stephens, which the court will grant. Miller also responded to both motions, making the matter ripe for disposition.

## II. Discussion

### A.

Punishments or prison conditions are "repugnant to the Eighth Amendment" if they . . . involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotations omitted). To prove that the course of medical treatment he received amounted to a constitutional violation, an inmate must show that personnel to whose care he was committed exhibited "deliberate indifference" to his "serious medical needs." Id. at 104-105. Inadvertent failure to provide treatment, negligent diagnosis, and medical malpractice do not present constitutional deprivations. Id. at 105-106.

"[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted). An official acts with deliberate indifference if he was aware of facts from which he could draw an inference that a substantial risk of harm existed, drew that inference, and disregarded or responded unreasonably to the risk. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Plaintiff must state facts showing that defendants' "actions or omissions [were] sufficiently harmful" and caused serious injury or aggravation or deterioration of an existing medical condition. Estelle, 429 U.S. at 100-101 (finding proper the court's dismissal of inmate's claim of insufficient medical treatment, where inmate complained of pain not relieved by medical treatment provided); Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) (finding claim of cruel and unusual punishment must include showing plaintiff suffered serious injury

6

from alleged violations); Staples v. Virginia Dep't of Corrections, 904 F. Supp. 487, 492 (E.D. Va. 1995) (dismissing § 1983 medical claim based on inmate plaintiff's failure to demonstrate "an unnecessary and wanton infliction of pain which has resulted in serious medical or emotional deterioration").

A disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not implicate the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Questions of medical judgment are not subject to judicial review under § 1983. Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975).

Supervisory officials may generally rely on the opinion of the medical staff as to the proper course of treatment and cannot be vicariously liable for constitutional violations committed by officials under their supervision. Miltier v. Beorn, 896 F.2d 848, 855 (4th Cir. 1990). To prove a supervisory official's liability, plaintiff must show that the official was personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment decisions, or tacitly authorized or was indifferent to the prison physicians' misconduct. Id. at 854.

**B.**

To state a cause of action under § 1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). Plaintiff's claims cannot survive a motion to dismiss unless "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S.662, 129 S. Ct. 1937, 1949 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (finding motion to

7

dismiss properly granted where plaintiff's factual allegations do not state "plausible" claim for relief). In addressing the sufficiency of the plaintiff's complaint, the court must view the facts in the light most favorable to the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotations omitted).

In their motion to dismiss, Defendants Marsh and Meadows do not deny that Miller suffered pain caused by his arthritis and flat feet. For purposes of this opinion, the court will accept as true Miller's allegation that his conditions caused him pain severe enough to constitute a serious medical condition. Dr. Marsh and Nurse Meadows assert, however, that Miller's allegations fail to state any claim that that they acted with deliberate indifference to his serious medical needs. The court must agree.

First, Miller fails to allege facts to show that Dr. Marsh or Nurse Meadows knew about and ignored any of Miller's medical needs. On the contrary, Miller's detailed allegations demonstrate that the doctor, the nurse, and/or the other medical staff at Augusta logged and responded to Miller's many complaints about his medical problems and treatment, discussed his concerns and alternative treatment options with him, attempted multiple and varied treatments, ordered work status changes and bunk accommodations, and recommended ongoing exercises, to address Miller's pain. If at some point Dr. Marsh stopped seeing Miller for the same complaints because the doctor believed he had offered Miller all the treatment options appropriate for Miller's conditions, Miller still fails to demonstrate that the doctor did so despite knowledge of Miller's serious medical need for some unattempted treatment.

Second, Miller does not allege facts showing that Marsh and Meadows wantonly inflicted unnecessary pain on Miller or caused him to suffer serious injury or aggravation, or physical

8

deterioration of his conditions. Estelle, 429 U.S. at 100-101; Strickler, 989 F.2d at 1381. Miller's physical conditions caused the pain, and the defendants tried to alleviate that pain, by prescribing various medications, injections, supportive footwear, stretching exercises, and lifestyle changes like losing weight, work status adjustments, and new bunk assignments. The court must accept as true Miller's contention that the defendants' course of treatment did not eliminate his severe pain. Miller's detailed allegations, however, support the conclusion that defendants regularly addressed Miller's conditions and tried every treatment to relieve his pain. Thus, Miller's own complaint undermines his assertion that the defendants deliberately refused to provide effective treatment for his pain.

Miller's allegations against Nurse Meadows are insufficient for another reason. Miller states no facts about Nurse Meadows' personal involvement in diagnosing his medical problems or prescribing medical treatment. Miller cannot prove liability against Nurse Meadows, merely based on her administrative position. At the most, Miller alleges that Nurse Meadows responded unreasonably to his informal complaints and grievances about the doctor's course of treatment.[4] As a nurse, she is entitled to rely on the doctor's medical judgment as to the appropriate course of treatment for Miller's conditions and cannot override the doctor's orders. Miltier v. Beorn, 896 F.2d at 854-55.

At the heart of the matter, Miller's complaint reflects that he has more confidence in his own judgment about his treatment needs than he has in Dr. Marsh's medical judgments on such matters. Dr. Marsh advised Miller that he had no additional treatment to offer that would alleviate Miller's pain better than treatments already attempted or being provided, while Miller

---

[4] Miller complains about Nurse Meadows' responses to his grievances as follows: when Miller complained about not receiving medication or footwear that alleviated his pain, Nurse Meadows admitted this statement was true; and when Miller complained about Dr. Marsh's outburst in response to Miller's claim that medical staff had denied him treatment, Meadows replied that Miller should follow the doctor's medical advice.

9

believed the doctor should allow Miller to consult a specialist. Under § 1983, the court cannot question the propriety of the doctor's medical judgment. Russell, 528 F.2d at 319. The disagreement here between doctor and patient over the appropriate course of treatment amounts to an allegation that the doctor acted negligently in making treatment decisions, which is not sufficient to show the deliberate indifference necessary to state an Eighth Amendment claim cognizable under § 1983.[5] Estelle, 429 U.S. at 105-106. For the stated reasons, the court grants the motion to dismiss Miller's § 1983 claims against Defendants Marsh and Meadows.[6]

## C.

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Then, the burden shifts to the nonmoving party to show that such a factual issue does exist. See Matsushita

---

[5] The court declines to exercise supplemental jurisdiction over any related state law claims, pursuant to 28 U.S.C. § 1367(c), and dismisses such claims without prejudice.

[6] Because the court concludes that Miller's allegations against Defendants Marsh and Meadows do not state an actionable constitutional claim, the court need not separately analyze defendants' additional defense of qualified immunity as an additional ground for dismissal. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that where defendants raise qualified immunity defense, district court may first address whether plaintiff states constitutional claim).

10

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The court considers a pro se plaintiff's verified complaint as an affidavit that may defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Defendants Schilling, Stephens, and Hepler filed affidavits in support of their motion for summary judgment, providing information about their job responsibilities within the VDOC, which Miller does not dispute. The court concludes that in light of defendants' evidence, Miller fails to demonstrate any genuine issue of material fact remaining at issue for trial.

### a. Fred Schilling

Schilling compares his job as Director of the Office of Health Services ("OHS") for the VDOC to that of hospital administrator. Schilling is not a medical doctor and does not make decisions about inmates' medical or dental treatment or determine whether an inmate has a medical need for referral to a medical specialist. Schilling relies on the professional judgment of the doctors and nurses hired by the VDOC to provide treatment to inmates in each VDOC prison facility.

Each institutional physician has the discretion, in his medical judgment for the good of the patient, to request medical testing or referral of the inmate to a medical specialist outside the institution. The OHS has a consulting physician review each such referral request. After this review, the consulting doctor either approves the request, asks for more information, or recommends an alternative treatment for the patient. When the inmate's treating physician at the prison receives a recommendation from a consulting physician for an alternative treatment, the treating doctor may provide that treatment, or may discuss the matter with the consulting specialist or with Dr. Stephens as VDOC Chief Physician. Ultimately, however, the treating

11

physician has the authority to order the outside services if he believes them to be medically necessary for his patient, even if his decision disagrees with the recommendations of the consulting physician and Dr. Stephens. After reviewing his records, Dr. Stephens did not find any requests from the institutional physician for Miller to see a specialist or a consulting physician.

Schilling also plays an administrative role with regard to inmate grievances concerning complaints about medical care. After an inmate attempts to resolve a medical matter informally and then submits a regular grievance to the warden for a Level I Response, that inmate can appeal an unsatisfactory response to OHS. Appropriate staff members at OSH investigate each such appeal that concerns an inmate's complaint about the treatment the institutional physician has provided to him and draft the appeal response (Level II Response); once OHS staff members finalize the response, Schilling signs it.

Schilling states that Miller appealed four Level I grievance responses to OHS, complaining of pain from flat feet and asking for custom arch supports, complaining that the Percogesic Dr. Marsh prescribed was ineffective and asking for a follow up visit, and twice requesting referral to a specialist for help with hip and heel pain. OHS staff investigated each appeal, determined from the information provided that each of the grievances Miller appealed was unfounded, and drafted Level II responses, which Schilling signed. The Level II responses advised Miller that the Augusta physician would determine the course of his medical treatment, that Miller should follow physician's orders, and that he should follow sick call procedures to seek additional treatment, although the physician would determine the medical need for follow up visits.

Generally, as a supervisory official with no medical expertise, Schilling may rightfully rely on the medical judgment of the prison doctors to determine the proper course of treatment for an inmate's condition. Miltier, 896 F.2d at 854-55. To overcome such reliance, Miller must offer evidence demonstrating that Schilling knew the care provided by Dr. Marsh was so obviously incompetent that it posed a substantial risk of harm to Miller's health. Id. at 855. Miller has not done so.

From his role in processing Miller's grievances, Schilling learned of Miller's dissatisfaction with Dr. Marsh's treatment decisions. Schilling states that when OHS staff members investigated each grievance,[7] they found that the prison medical staff had evaluated Miller, assessed his conditions, and offered multiple treatments and ongoing exercise plans, although not the ones Miller believed he should receive, i.e., referral to a specialist and custom footwear. Miller presents no evidence suggesting that Schilling's reliance on Dr. Marsh's medical judgment was unreasonable, in light of the number of medical visits and various treatments Miller received at Augusta. Moreover, based on the evidence that Dr. Marsh never made a request to OHS to send Miller to an outside specialist, Miller cannot demonstrate that Schilling had any personal involvement in deciding against this service Miller desired. Finding no genuine issue of material fact in dispute on which Miller might demonstrate that Schilling was deliberately indifferent to his serious medical needs, the court concludes that Schilling is entitled to summary judgment.

---

[7] Miller's mere dissatisfaction with Schilling's responses to his grievances does not support any viable constitutional claim. Adams, 40 F.3d at 75; Burst v. Mitchell, 589 F. Supp. 186, 192 (E.D. Va. 1984) (finding prison officials absolutely immune from liability stemming from their participation in Virginia's inmate grievance procedures).

13

### b. Defendant Hepler

Miller's claim against this defendant is that she did not allow him to select new arch supports from the catalog after Dr. Marsh had told Miller he could do so. In response, Hepler states that as the Office Services Specialist for Augusta, her job duties include ordering medical supplies, such as arch supports, when the institutional physician orders them for an inmate. Hepler states, however, that she is not a health care provider and makes no decisions regarding inmates' medical needs or treatment. Hepler does not remember Miller or the type of arch supports that he received while at Augusta. Hepler denies that she would have told Miller or any other inmate that she had already provided him with "the best [arch supports] available," because she only orders medical supplies as ordered by the doctor.

The court concludes that Hepler is entitled to summary judgment. No evidence in the record supports a finding that Hepler knew Miller had a serious medical need for a particular kind of arch support and refused to obtain it for him, all the while knowing that her failure to do so placed Miller at a serious risk of harm. Moreover, even now, Miller does not demonstrate that some type of arch support other than the ones he received and wore at Augusta would alleviate his foot pain. Thus, Miller fails to present any genuine issue of material fact on which he could prove that Hepler was indifferent to his medical needs.

At most, Miller alleges that Hepler did not follow Dr. Marsh's direction to allow Miller to select a new pair of supports from the catalog. Such inadvertent actions do not give rise to a constitutional claim. Estelle, 429 U.S. at 105-106. For the stated reasons, the court grants Hepler's motion for summary judgment.

14

III

For the reasons stated, the court concludes that Miller fails to allege facts demonstrating that any of the defendants acted with deliberate indifference to any serious medical need for different treatment. Therefore, the court grants the motion to dismiss filed by Dr. Marsh and Nurse Meadows, grants the motion for summary judgment by Schilling and Hepler, and grants Miller's motion for nonsuit as to Dr. Stephens. An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER: This 12th day of March, 2012.

/s/ Glen Conrad
Chief United States District Judge